And we will go on to case number four, which is Appeal 14-17-13, and this one is Harden v. Marion County Sheriff's Department. Hi, Mr. McQuarrie. You can come up if you will. Thank you. Your Honor, as it pleases this Court, my name is Jeff McQuarrie, and I represent Eric Harden, the plaintiff appellant in this case. When someone goes to the police and accuses someone else of committing a crime against him, the normal procedure is for the police to go to the putative victim and ask the victim what he thinks happened, and then go to the accused person and get the accused side of the story. That's not what happened when, in this case, when Victor Rybold went into a sheriff's department office after he had recently been released from jail, pointed to a sheriff's deputy, and said, that man stole my money. Instead of immediately interviewing the victim, or immediately even interviewing the accused, the very next day, the sheriff's department opened up a criminal investigation on the arresting officer. The sheriff's department had a number of potential suspects to choose from. About a dozen individuals are involved in the chain of custody of property of an arrested person from the time of the arrest, to the counting of the money, to the transporting of the money to the arrestee processing center, and to storing it overnight until the suspect is released. About a dozen people were involved in that process. But the only person upon whom the sheriff's department immediately opened a criminal investigation was the one individual among those dozens who had previously testified on behalf of victims of race discrimination, resulting in two senior officers of that department being demoted. But the criminal investigation wasn't the determination process. There was also an internal affairs, or whatever you want to call it, investigation, right? When the criminal investigation proved inconclusive, the matter was subsequently transferred to the internal affairs department. And that's what led to the termination, is the internal affairs investigation? Yes, Your Honor. How was Mr. Hardin, or Officer Hardin, treated differently in the internal investigation as compared with this other fellow, Lieutenant Frazier, or whatever his name was? First of all, Your Honor, it is very unusual for an accusation of this type to even lead to an internal affairs investigation. In the memory of Hardin's supervisors, this has never happened before. The matter is referred to for criminal investigation, if it is addressed at all. Your Honors, I'm sure, are assuming that when citizens go and make a complaint of this sort, that these complaints will be dealt with very seriously. But sadly, as we've designated ample evidence, frequently people who complain that money is stolen from them in the course of arrest or overnight incarceration, simply have their complaints put off or ignored. I understand it's part of your point that the fact that there was an internal investigation is part of the strange state of affairs. But I'm talking about once you have the internal investigation, how was your client treated differently from, let's say, Lieutenant Frazier? Because the internal affairs investigation was only about Eric Hardin. If you look at the opening sentence of the investigator's report, we were assigned to conduct an internal affairs investigation on Eric Hardin. So he was the only person treated as a suspect, is basically what you're saying. Exactly, Your Honor. This was not an agnostic effort to find out what happened to the money. This was an investigation to determine whether Eric Hardin did something wrong, and it's pretty clear that they had a lot of preconceived notions that he did. Tell me this. Why should we be concerned with whether internal affairs was correct to determine that he was responsible for the theft? In other words, isn't the only consideration here whether the employer believed he was responsible and terminated him, even if that belief was faulty? And what we need to get to, I think, is what evidence is there that this internal affairs investigation was a sham as opposed to simply, let's say, being misguided? Your Honor, I think the first piece of evidence that the internal affairs investigation was a sham was that it was directed solely against Eric Hardin. And second, that it followed a criminal investigation where the investigator himself said that Eric Hardin was cleared through his investigation, and that the criminal investigator says he doesn't know who stole the money. The fact that the investigation occurred at all, when limited to one of the many persons who potentially had access to that money, indicates that the department was never really interested in the truth in the first place. As Your Honors are well aware, there are a number of paths by which a retaliation plaintiff can prove that he was the victim of retaliation. I'd like to address first the indirect method. Under that method, a plaintiff will prevail if he can show four elements that after complaining of discrimination, he and not some other similarly situated person suffered an adverse personnel action despite doing his job satisfactorily. Two of those elements are not in dispute. It's clear that Eric Hardin complained, supported the testimony of some African American deputies, ultimately resulting in discharge of two other, excuse me, the demotion of two superior officers. And it's also not in dispute that he was ultimately fired. The district court acknowledged that the plaintiff designated enough evidence to show that he was doing an excellent job as a deputy sheriff. The only element that the district court found the plaintiff had not met under the indirect method was to show that some other similarly situated employee was not treated the same. Your Honors, that finding was erroneous because there is a comparator, and that is Lieutenant Frazier, the person that the victim of the crime actually identified as the person who stole the money. The district court... Does the record indicate whether he gave any reason as to why he thought Lieutenant Frazier had stolen the money? It does not, Your Honor. In fact, it was just a bigoted expletive, wasn't it? It is entirely possible that Reibold said that merely out of racial prejudice because Lieutenant Frazier is black. A reasonable investigator or other superior in that office had taken it that way and said, you know, I'm not going to follow up on that. There's no other basis upon which to do it. Your Honor, I think a reasonable investigator might suspect that, but I don't see how a reasonable investigator could dismiss it without following up. The fact of the matter is Mr. Hardin was the only person who was in the presence of the unsealed envelope by himself. I do not believe that that's true, Your Honor. First of all, as the prosecutor believed, the entire process of transporting the bag from the city county building to the arrestee processing center was essentially unmonitored. No one knows what happened to it there. Is anybody saying that the standard operating procedure of sealing the bag through that transit wasn't followed? Apparently it was not. Apparently it was not. What evidence is there of that? Your Honor, I don't believe I can answer that. I can merely tell you that the prosecutor's office did not believe that the chain of custody was established during transport, and that was one of the reasons that the prosecutor's office declined to file charges. Did Mr. Hardin agree that he was alone with this bag at some point in time? Absolutely not. He says that he carried papers into the private office with him while he was making arrangements with the Department of Child Services for the care of Mr. Reibold's little boy, and we believe that what Mr. Reibold may have seen was him carrying those papers. So Mr. Hardin testified, no, I wasn't. I mean, in his deposition or whatever, he said, I didn't have the bag by myself. Absolutely, Your Honor. And I think something very important to note is the notion that Eric Hardin carried that property bag into the private office was given to him by Deputy Wayne Sharp. The deputy coached Hardin through leading questions. This is not something that Hardin volunteered. This is something that was suggested to him. Detective Sharp never gave Hardin the opportunity to tell his side of the story in general terms. Reibold, in the course of that interview, never says that Hardin took my money. This was implanted by the department's detective into Reibold's mind in leading questions in a coached interview in his very first encounter in the investigation. I'm going to have to stop. I'm sorry. Thank you, Your Honor. Thank you. Okay. Mr. Overholt. Good morning. Good morning. Tony Overholt. I'm here to represent the Marion County Sheriff's Department. There are two fundamental things this court must understand. First, it is undisputed that somebody employed with the Marion County Sheriff's Department stole $100 from Mr. Reibold. The department wanted to know who did it. Secondly, the plaintiff's approach in this case is focused on the wrong issue. All the plaintiff wants to talk about, for the most part, is the investigation done by Detective Sharp, the criminal investigator. That was not the investigation that resulted in termination. That was an investigation done by Mr. Sharp. It was brought to the prosecutor's office. The prosecutor's office, for reasons that are not in the record, declined to go forward with the prosecution. And I agree with you on that. I mean, this is a different standard of proof, obviously. It's whether you can prove a criminal case against a person. But the plaintiff also does talk about what I guess I would sort of generically refer to as what he says are irregularities in the way the internal affairs investigation was done. In other words, this whole idea that they only focused on one guy. Well, there's no evidence of that. I mean, the plaintiff says there are irregularities, but there aren't any. At least there's not any provided by the evidence. There were recordings of all of the interviews, right? There were. Or at least some of them. Some of them. There were recordings. There are at least transcripts. Okay, fair enough. There was this issue about the recordings and them being preserved. There was at least transcripts. Yes, there are transcripts of everything. So were any of the other people sort of treated? So part of what Mr. McQuarrie argues is that his client was treated in an accusatory way and nobody else was. What about that? Well, I don't think that's true, although I think as the investigation progressed, things developed in such a way that it pointed at Mr. Harden. Okay? He also says that the report says this was an investigation of Mr. Harden. Well, that's the same. I would encourage the Court to actually read the introductory paragraph. That introductory paragraph most likely was written at the end after the conclusion was reached that Mr. Harden was the suspect or was the guilty party. All the people involved in this incident were all interviewed by Internal Affairs. This wasn't a situation where they went just to Mr. Harden and said, hey, we're going to interview you and nobody else. If you read the Internal Affairs report that's in the supplemental appendix, they interviewed everybody who was involved in this incident, and there were a total of, I think, 11 or 12 people. The record mentions that in 57 of 59 arrest reports, Mr. Harden listed the cash amounts or put a zero with a strike through it to indicate no cash, including one report that listed an amount of 25 cents. How many of the 57 instances involved amounts less than 500? Of the two reports with nothing listed, one was for Riebold, but what were the circumstances surrounding the other report in which no amount was listed? Can you answer that horrible question? It's not because it's a bad question. I just don't know the answer. And I don't think it's in the record. Going back, though, to the investigation into the Internal Affairs investigation, it was determined, in fact, that Mr. Harden had, in a whole host of circumstances, arrested persons and put down exactly the amount of money that was on them. More importantly, or perhaps in addition to that, during the investigation he had with Internal Affairs, he was asked a question he couldn't answer. And based on that, the question essentially was this. He had earlier testified that he didn't know how much money was in Victor Riebold's wallet. And then he was asked a question, well, how is it you determine whether or not to fill out the information on the OAR, the police report? And he said, well, you only fill that out if you know there's more than $500 at issue. So the Internal Affairs investigator said, well, wait a minute. How is it that you knew there was more than $500 if, in fact, in other words, how could you have known that if you didn't count the money? You couldn't just leave it blank. And his answer for that is that somebody else had told him. Well, here's what he said. There's that. Now, the quote that's actually on page 5 and 6 of Mr. Harden's brief to this court says, he simply conflated two different forms. And again, that's on the bottom of page 5 and top of page 6. Well, that's his answer now. He was apparently, he says he was confused. Well, that may be. But it was also a fair and appropriate decision for the investigators to think not that he was confused, but that they caught him in a lie. And if they caught him in a lie, unlike Lieutenant Fraser or anybody else who was investigated in this incident, they were entitled to conclude reasonably that he was the one who stole the money. In other words, he said that he did not mark anything on a cash line in the reports unless the amount was over $500. And that was demonstrably false. Correct. It was demonstrably false because he didn't know how much money was in it. It was also demonstrably false by his past conduct. Because he fills those forms out when they have as little as 25 cents on them. And based on that, again, that's why I think toward the end of this investigation, it turned. It wasn't, it was open-ended at the beginning, but by the time they were done, they'd concluded it was Eric Hardin who stole the money. And that's why the internal affairs report is written in such a way that it identifies Eric Hardin as the person who stole the money. There's nothing inappropriate about the way the report is written, that it was some rush to judgment. Not at all. The report is very long and very detailed and involves detail and provides extensive information about all the interviews of all the witnesses. Not just Eric Hardin. So your argument about the references to the criminal investigation is it doesn't matter so what. It really didn't have anything to do with the termination. The termination was about the internal affairs, and that was done completely on the up-and-up. That's right. Now, there's an allegation that somehow there's some departure from procedure because there was a criminal investigation followed up by an IA investigation. Well, there's no evidence that that's unusual at all. Mr. Hardin's lawyer says it's unusual, but there's no record citation anywhere in the briefs anywhere that show that's unusual. As a matter of fact, I will tell you from my experience representing the Sheriff's Department for many years, it's not unusual at all. Well, you just criticized him. Yeah, I thought we had the same thing he did. So, again, there's no evidence that that is a departure from procedure in any way. Again, what we have here is a situation where it is undisputed that he had, that Victor Reibel had his money stolen, and the department wanted to figure out what happened to it because they knew it had to be someone within the department who took it. Now, my next point sort of goes along with that, and it goes to this point that somehow these cases are never investigated. There are allegations and some evidence from a former investigator that somehow these are always brushed aside and no one does anything with them. Well, it's certainly true that there are times when inmates make claims that aren't substantiated and they are not pursued. But in this case, the department concluded that, in fact, there had been a theft. Because that made that threshold determination that there had, in fact, been a theft, it was investigated thoroughly, and that is different than some of the other cases where inmates make some claims and they just aren't substantiated. And there's nothing in the record that says that, in fact, in this circumstance, under this set of facts, the department would have investigated any other kind of theft, again, had these facts been present with someone else. Your Honor, that's really all I have, unless the court has additional questions for me. Thank you very much. Thank you. So, Mr. McQuarrie, you used up your time, but I'm going to give you another minute or so. Thank you, Your Honor. I greatly appreciate it. I'd like to speak first to the spoliation issue. The plaintiff has not received transcripts of the internal affairs investigation, despite numerous requests. That is why we requested the spoliation instruction from the judge. I believe that the internal affairs interview with Victor Rival would be critical. Was he coached in that interview the way he was in the criminal investigation? I don't know. This is something I tried very hard to get and did not receive. And, second, the fact that no case has been referred to internal affairs as a result of this kind of theft accusation is cited in the record. Both of Harden's immediate supervisors, Sergeant Todd and Lieutenant Neal, have said that in their memory this has not ever happened to anyone that they've supervised. So it is well supported in the record. Thank you, Your Honors. We, the plaintiff, would request that this case be reversed and remanded for trial. Thank you very much to both counsel. And the case will be taken under advisement.